## DILLON, READ & CO., Inc., v. HOEY.

District Court, S. D. New York.
June 10, 1942.

Wright, Gordon, Zachry, Parlin & Cahill, of New York City, (John P. Ohl and John A. Reed, both of New York City, of counsel), for plaintiff.

Edward J. Ennis, Sp. Asst. to Atty. Gen. (William L. Lynch, Asst. U. S. Atty., of New York City, of counsel), for defendant.

RIFKIND, District Judge.

This cause of action was tried on an agreed statement of facts.

It is an action against the Collector of Internal Revenue for a refund of taxes alleged to have been erroneously and illegally collected by defendant from plaintiff in connection with two alleged transfers of corporate bonds. The only issue is whether the transactions hereinafter described were subject to the tax imposed by section 800, Schedule A, subd 9, of the Revenue Act of 1926, as amended by section 724 of the Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Acts, pages 284, 297. On January 17, 1933, plaintiff, a Maryland corporation, having its principal office in New York, entered into an agreement with Union Electric Light and Power Company to purchase the General Mortgage Gold Bonds of the latter company dated May 1, 1932 and due May 1, 1957, in the principal amount of $11,250,000. Payment and delivery were to take place on January 27, 1933. The price agreed upon was 93¾ or $10,546,875, plus accrued interest.

In order to insure its ability to discharge this large obligation, plaintiff, on January 17, 1933, entered into two series of agreements and between January 17th and January 27th entered into a third series of agreements.

The first series was entered into with ten underwriters, denominated a Primary Group, of which plaintiff was manager. Plaintiff also became the eleventh member of the Primary Group and to evidence that fact purported to enter into such an agreement with itself. Each of these agreements provided that the members of the Primary Group were obliged, upon written request of the plaintiff, to purchase a quantity of the aforesaid bonds (not purchased by dealers) at 95½. Each member of this Group also agreed to perform the obligations of any defaulting member of the Group ratably, in accordance with a formula specified in the agreement. The agreement further provided that, "Participants in the Primary Group will, to the extent that they fulfill their obligations hereunder, be allowed a gross fee equal to ¾% of the principal amount of the bonds represented by their respective participations".

The second series of agreements was entered into with three underwriters who, with plaintiff as a fourth member, were called the Original Group. Again plaintiff evidenced its membership in this Group by purporting to enter into an agreement with itself. Members of this Group agreed, upon the written request of the plaintiff, to buy and pay for a quantity of the aforesaid Bonds (not purchased by dealers or the Primary Group) at 94¾. To the extent that they fulfilled their obligations members of this Group were to receive a fee of 1% of the principal amount of the Bonds represented by their respective participations.

The agreements of the third series were made between January 17 and January 27, 1933, with a large group of dealers, each of whom agreed to subscribe for a specified number of bonds at 97¼ less 1¾ commission. In the aggregate the dealer agreements embraced bonds in the principal amount of $7,642,000. On January 27, 1933, plaintiff received the bonds from Union Electric Light and Power Company and paid the stipulated price. Thereafter, it delivered to the dealers bonds in the principal amount of $7,642,000 pursuant to the third series of agreements. It sold the balance of the bonds to its customers.

Plaintiff never exercised its right to call upon any member of the Primary Group or Original Group to purchase any bonds and it delivered no bonds to any of them. The stamp tax, at the rate of 4 cents on each $100 of face value, payable on the transfer from the plaintiff to the dealers and its customers was paid in full.

The members of the Primary Group and the members of the Original Group received from plaintiff ¾% and 1%, respectively, in proportion to their several commitments.

The Commissioner of Internal Revenue assessed two additional stamp taxes, each calculated on the full face amount of the bonds: the first on an alleged transfer of the bonds from plaintiff to the Original Group; and the second on an alleged transfer from the Original Group to the Primary Group. Plaintiff paid the tax, filed the claim for refund, and after rejection, instituted this suit.

The applicable statute is section 800 of the Revenue Act of 1926, as amended by section 724 of the Revenue Act of 1932, which reads in part as follows:

"*  *  * there shall be levied, collected, and paid, for and in respect of the several bonds, debentures, or certificates of stock and of indebtedness, and other documents, instruments, matters, and things mentioned and described in Schedule A of this title *  *  * the several taxes specified in such schedule.

"Schedule A.—Stamp Taxes

*     *     *     *     *

"9. Bonds, etc., sales or transfers: On all sales, or agreements to sell, or memoranda of sales or deliveries of, or transfers of legal title to any of the instruments mentioned or described in subdivision 1 and of a kind the issue of which is taxable thereunder, whether made by any assignment in blank or by any delivery, or by any paper or agreement or memorandum or other evidence of transfer or sale (whether entitling the holder in any manner to the benefit of such instrument or not), on each $100 of face value or fraction thereof, 4 cents: *  *  *".

Substantially, the same provisions are now contained in sections 3480 and 3481 of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, §§ 3480, 3481.

The question presented is whether the agreements of the plaintiff with the Primary Group and the Original Group constituted sales, agreements to sell, memoranda of sales or deliveries or transfers of legal title of the bonds. Clearly no sale occurred. It is equally clear that the agreements were agreements to buy but not agreements to sell. The distinction is well recognized in the financial markets. An agreement to sell is called a "call"; an agreement to purchase is called a "put". The distinction has been acknowledged in the Regulations. Thus Regulations 71 (revised July, 1932) article 125(2) (a) contained the following: "The term 'agreement to sell' includes options, calls in 'puts and calls', offers, indemnities and privileges, and contracts, either in writing or by parol, to sell on the deferred or partial payment plan;".

That "agreement to sell" does not embrace an agreement to purchase has been held in Treat v. White, 1901, 181 U.S. 264, at page 268, 21 S.Ct. 611, 613, 45 L.Ed. 853. The following language therefrom is pertinent hereto: "That there is a difference between an agreement to sell and an agreement of sale is clear. The latter may imply, not merely an obligation to sell, but an obligation on the part of the other party to purchase, while an agreement to sell is simply an obligation on the part of the vendor or promisor to complete his promise of sale. That Congress recognized the difference between these two terms is evident, because in the very next paragraph of Schedule A it provides, in reference to merchandise, for a stamp 'upon each sale, agreement of sale, or agreement to sell.' That no stamp duty was imposed on agreements to buy (or, in the vernacular of the stock exchange, 'puts') furnishes no ground for denying the validity of the stamp duty on agreements to sell. The power of Congress in this direction is unlimited. It does not come within the province of this court to consider why agreements to sell shall be subject to stamp duty, and agreements to buy not. It is enough that Congress in this legislation has imposed a stamp duty upon the one, and not upon the other."

That there was no delivery and no transfer of legal title has been stipulated.

The language of the statute is precise. It does not impose a tax upon an agreement to purchase when it is not part of an agreement to sell. It imposes no tax upon an option which authorizes the holder of the option to require the grantor thereof to purchase bonds.

By recent amendment to the Regulations the distinction between agreements to buy stock which are taxable and agreements to buy bonds which are tax free is explicitly recognized. Regulations 71 (1941 edition), section 113.63 provides in part:

"Sales and transfers subject to tax.—The tax on bond transfers imposed by section 3481 is similar in scope to the tax on stock transfers imposed by sections 1802(b). Accordingly, the various examples set forth in section 113.33 of sales and transfers of stock subject to the stock transfer tax apply with some exceptions to sales and transfers of bonds.

"The examples stated in paragraph (j) of section 113.33 do not apply to the bond transfer tax since transfers of rights to receive and rights to subscribe for bonds are not subject to the tax imposed by section 3481".

Cases relied on by defendant, which hold the transfer of the right to receive stock taxable, are not in point since they are governed by a different provision of the statute which expressly made taxable "rights to subscribe for or to receive" shares of stock. Subd. 3. Founders General Corporation v. Hoey, 1937, 300 U.S.

268, 57 S.Ct. 457, 81 L.Ed. 639; Raybestos-Manhattan, Inc., v. United States, 1935, 296 U.S. 60, 56 S.Ct. 63, 80 L.Ed. 44, 102 A.L.R. 111.

One additional aspect of the case requires comment. It has already been noted that plaintiff itself became a member of the Primary Group and of the Original Group. To evidence its membership it went through the form of executing agreements with itself. That formality may have appeared to be a convenient method of setting forth its relative participation in each of the group undertakings for the purpose of calculating the ratable obligations and remunerations of the participants. But I find it utterly impossible to view plaintiff's undertaking to buy bonds from itself as a taxable transaction under the statute. More than half the tax assessed and collected from plaintiff represented such alleged hypothetical transfers from plaintiff to itself. Defendant argues the analogy of a transfer from an executor to himself as legatee. The difference between the two, it seems to me, is too well recognized to require exposition.

Plaintiff is, therefore, entitled to judgment for the amount erroneously collected, together with interest from October 8, 1936.